J-S51041-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| ALEXANDER CRUZ-CINTRON, | : | |
| | : | |
| Appellant | : | No. 1953 MDA 2013 |

Appeal from the Judgment of Sentence entered on September 19, 2013
in the Court of Common Pleas of Berks County,
Criminal Division, No. CP-06-CR-0000546-2013

BEFORE:  BOWES, OTT and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.:        **FILED SEPTEMBER 04, 2014**

Alexander Cruz-Cintron ("Cintron") appeals from the judgment of sentence imposed following his convictions of three counts of robbery, six counts of conspiracy, and one count each of burglary, theft by unlawful taking, and criminal trespass.[1]  We affirm.

The trial court set forth the underlying facts as follows:

[Cintron] and Jonathan Landron, residents at 1230 Spring Street in Reading, were looking for "someone to burn"—that is, someone "to rip off [or] steal from." In November 2012, [Cintron] approached his longtime friend, Danielle Mojica ["Mojica"], and suggested that she could help them "burn" Raymond Hiester ["Hiester"].  [Cintron] knew that Hiester and Mojica sometimes smoked marijuana together and that Hiester bought cigarettes for Mojica, gave her money, and had promised to buy her a tablet computer.  Mojica at first told [Cintron] and Landron she did not want to steal from Hiester—she worried that

---

[1] 18 Pa.C.S.A. §§ 3701(a)(1), 903(a)(1), 3502(a)(1), 3921(a), 3503 (a)(1)(i).

doing so would jeopardize his willingness to buy her gifts, including the tablet.

A few days after [Cintron] first proposed the idea, he and Landron repeated the idea of stealing from Hiester. Mojica again said she was not interested. But on November 26, 2012, Mojica learned that the plans to victimize Hiester were already in motion. [Cintron] and Landron showed Mojica a black handgun which, she was told, would only be used to scare Hiester—it "wasn't to be fired or anything like that." Two days later, four individuals from New York—a Hispanic female known as "Kay-Kay" and three males, one black and two Hispanic—arrived in Reading to assist in the operation.

On the morning of November 28, Mojica received a phone call. On the other end of the line she could hear [Cintron], Landron, and Kay-Kay, who informed her that the plan was going forward but assured her nothing "serious" was going to happen. They picked Mojica up and brought her back to [Cintron] and Landron's residence. [Cintron] and Kay-Kay persuaded Mojica to call Hiester and arrange to go to his house.

\*\*\*

After Mojica made plans with Hiester, Kay-Kay drove her to Hiester's house, located in the 500 block of South 18th Street in Reading. Kay-Kay left, and Mojica went inside, where she and Hiester began smoking marijuana and talking. After a few minutes, Mojica told Hiester that she had left her cigarettes in the car in which she had arrived, and that she wanted to smoke more marijuana. Hiester went out to purchase some cigarettes and blunt paper from a corner store nearby. Hiester left through the back door, and Mojica remained at the house.

As soon as Hiester left, Mojica called [Cintron] to let him know that Hiester was gone; concurrently, the three men from New York arrived at Hiester's home in Landron's car, a gold Mercedes sedan. After entering the home through the front door, they began looking for items to steal. They grabbed Mojica, taped her to a chair, and placed tape over her mouth. Hiester soon returned to his home, re-entering through the back door. He was met in the kitchen by a black male who was holding a black-and-silver handgun. The gunman told Hiester to "get on the ground" as soon as he walked into the room. Hiester hesitated,

and the gunman approached him, put the gun to his chest and tried to push him to the ground. Hiester resisted, and the gunman shot him in the chest.

Hiester did not lose consciousness, and he attempted to use a phone in the kitchen to call 9-1-1. Meanwhile, the gunman resumed digging through the contents of Hiester's desk. At that time, Hiester also became aware of a second male in the home, who was descending the stairs from the second floor while trying to fend off an attack by Hiester's Rottweiler. Fearing that the gunman would shoot the dog—or shoot Hiester again—Hiester called the dog and rushed out the back door to seek help.

Hiester found a neighbor and told him he had been shot by unknown individuals who were attempting to rob him inside his house. He then lay down in front of the neighbor's house to wait for the ambulance. While he was waiting for the ambulance, he saw [] two males run out the front door of his house, enter a "small silver car," and drive away. Police and emergency medical personnel arrived thereafter, where they found Hiester outside. Hiester was taken to the hospital to receive treatment for his gunshot wound. He was released from the hospital after only six hours.

Hiester's neighbor untied Mojica from the kitchen chair, and police questioned her throughout the day. Afterwards, Mojica sought out [Cintron] and Landron. [Cintron] returned Mojica's phone, which had been taken while she was tied up at Hiester's house. [Cintron] and Landron questioned Mojica about her statements to the police, but after she assured them they had not been implicated, they went to dinner together and then went bowling.

After Hiester was discharged from the hospital, he began to develop fluid buildup in his chest, which had to be drained. Surgery was required around the area of the bullet hole, while a pump drained fluid from the area. Hiester, a roofing and home improvement contractor, returned to work after about three weeks of recovery. Hiester discovered that an iPod touch, a new Samsung Galaxy II cell phone, and approximately 3 ounces of marijuana had been taken from his home.

Trial Court Opinion, 3/31/14, at 3-5 (citations omitted).

Cintron was subsequently arrested and charged with numerous crimes. After a non-jury trial, Cintron was convicted of the above-mentioned crimes. Cintron was sentenced to an aggregate prison sentence of twelve to forty years. Cintron filed a timely Post-Sentence Motion, which was denied. Cintron filed a timely Notice of Appeal.

On appeal, Cintron raises the following question for our review:

> Whether the trial court erred by not granting a new trial on the basis that the guilty verdicts for Counts 3, 4, 5, 6, 7, 8, 11, 12, 13, 14, 15, 16 were contrary to the weight of the evidence, where the only direct evidence linking [Cintron] to the crime was the incomplete, inconsistent, incredible and self-serving testimony of [] Mojica and inconsistent, incomplete Commonwealth evidence as to the vehicles involved concerning color, make and model, the time frame of events, and overall chain of events, including the underlying incident[?]

Brief for Appellant at 6.

Cintron contends that the verdict is against the weight of the evidence. *Id.* at 21. Cintron claims that the only evidence connecting him to the crime is Mojica's self-serving testimony. *Id*. at 22-26. Cintron points out that Mojica's testimony was inconsistent and contradictory. *Id*. Cintron further argues that the trial court abused its discretion because there was no corroborating testimonial or physical evidence to connect him to the criminal events. *Id*. at 26-27; *see also id*. (wherein Cintron argues that the Commonwealth failed to demonstrate that he was in any of the vehicles that were suspected of being used in transporting the perpetrators to Hiester's home).

The trial court set forth the relevant standard of review and addressed Cintron's claim as follows:

> The evidence presented to the fact-finder here included the testimony of [] Mojica, who comprehensively described the relevant events that transpired. Mojica detailed [Cintron]'s instrumental role in formulating the plan to "burn" the victim, soliciting her involvement over the course of multiple meetings. Mojica and the other men involved with the robbery met at [Cintron]'s residence the day of the incident, and Mojica called [Cintron] as the robbery plan was underway. Later, [Cintron] returned Mojica's cell phone, which had been "stolen" during the course of the robbery. [Cintron] challenges the reliability of this testimony, but the "credibility of the witnesses and the weight to be accorded to the evidence produced are within the province of the trier of fact, who is free to believe all, some or none of the evidence." *Commonwealth v. McCalman,* 795 A.2d 412, 415 (Pa. Super. 2002). Because the verdict was not contrary to the weight of the evidence and did not shock one's sense of justice, this [c]ourt denied the motion for a new trial. (Order, Oct. 2, 2013).
>
> When an appellant challenges a trial court's denial of a post-sentence motion for new trial based on weight of the evidence, the standard of review is limited to whether the trial court abused its discretion:
>
> > We do not reach the underlying question of whether the verdict was, in fact, against the weight of the evidence. We do not decide how we would have ruled on the motion and then simply replace our own judgment for that of the trial court. Instead, [the court] determines whether the trial court abused its discretion in reaching whatever decision it made on the motion, whether or not that decision is the one we might have made in the first instance.
>
> [*Commonwealth v. West,* 937 A.2d 521] (Pa. Super. 2007). An abuse of discretion "is not merely an error in judgment. Rather, it involves bias, partiality, prejudice, ill-will, manifest unreasonableness or a misapplication of the law." *Id*. (citations omitted). A proper exercise of discretion, by contrast, "conforms

- 5 -

to the law and is based on the facts of record." **Id**. Our order denying [Cintron]'s Post-Sentence Motion for a new trial conforms to the law and is based on the facts of record, as summarized above.

Trial Court Opinion, 3/31/14, at 10-11. We agree with the sound reasoning of the trial court and conclude that the trial court did not abuse its discretion in denying Cintron's weight of the evidence claim. **See id**.

Judgment of Sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/4/2014